# HAROLD SHEPPARD ET AL. *v.* BAY COUNTRY REALTY, INC. ET AL.

[No. 134, September Term, 1982.]

*Decided September 14, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Mark Alan Epstein* for appellants.

*Francis X. Pugh, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Robert deV. Frierson* and *Martin M. Kandel, Assistant Attorneys General,* on the brief, for appellees.

RODOWSKY, J., delivered the opinion of the Court.

Md. Code (1957, 1979 Repl. Vol.), Art. 56, §§ 212-232A, Title, "Licenses," subtitle "Real Estate Brokers," created the Real Estate Commission of Maryland (Commission) and provides for the licensing and other regulation of real estate brokers and salesmen. Section 217A establishes a real estate guaranty fund administered by the Commission (the Fund). In the present case the appellants unsuccessfully sought to be reimbursed from the Fund for the amounts that they had paid to acquire interests in two limited partnerships which had been represented to the appellants as formed to develop real estate. The ventures are now insolvent. In each venture the syndicator and manager was an individual who was licensed as a real estate broker. We shall hold that these circumstances do not bring appellants' claims within the scope of § 217A.

On February 28, 1979 the appellants complained to the Commission and made claim against the Fund based on the alleged acts and omissions of three persons, Kenneth Albert Patrick (Kenneth), a licensed real estate broker who traded as Bay Country Realty, Inc., Kenneth's wife, Leala M. Patrick (Leala), who was licensed as a salesman under Kenneth's license, and Ronald Jordan, formerly a salesman under Kenneth's license. In their consolidated claims, appellants alleged that they had

> subscribed for investment shares in what was represented to them to be two limited partnerships

known as Spa Haven Yacht Club Joint Venture [Spa Haven] and Baltimore-Washington International Yachting Center, Inc. (BWI) *[sic]*. Kenneth Patrick, along with Lela Patrick *[sic]* and Ronald Jordan, induced [appellants] to make their investments.

The dates and amounts of these subscriptions are as follows:

| Investor | Amount | Venture | Date |
|----------|--------|---------|------|
| 1. Rudolph & | $ 5,000 | BWI | 5/03/77 |
| Ruth | 10,000 | Spa Haven | 5/29/75 |
| Goldschmidt | | | |
| 2. Leonard & | 3,125 | BWI | 5/01/77 |
| Francine | 2,000 | Spa Haven | 2/28/76 |
| Goldschmidt | | | |
| 3. Leslie | 3,125 | BWI | 5/03/77 |
| Goldschmidt | 2,000 | Spa Haven | 2/28/76 |
| 4. Dr. Harold | 7,500 | BWI | 7/07/78 |
| Sheppard | 6,000 | Spa Haven | 7/21/75 |

After the Commission had entered a summary dismissal which the Circuit Court for Baltimore County reversed with remand, an evidentiary hearing was conducted before a hearing panel of the Commission. It again denied the claims as not falling within the coverage of § 217A (a) and the Circuit Court for Baltimore County affirmed. On our own motion the claimants' appeal to the Court of Special Appeals was brought before this Court prior to consideration of the matter in the intermediate appellate court. Only the Commission appeared in this Court to defend the judgment below.

Article 56, § 217A (a), at the time of the events giving rise to the subject claims, provided:

The Maryland Real Estate Commission shall establish and maintain a real estate guaranty fund from which, subject to the provisions of this section, any person aggrieved by any action of a real estate

broker or real estate salesman, duly licensed in this State, *arising out of a real estate transaction* and by reason of the theft of money or property, or money or property unlawfully obtained from any person by forgery or by reason of any fraud, misrepresentation or deceit by or on the part of any such real estate broker or real estate salesman or the unlicensed employee of any such real estate broker, or by reason of a violation of this subtitle by such broker, salesman, or employee may recover compensation in the amount of his actual loss as proven before the Commission. [Emphasis added.[1]]

The issue between the parties is over the construction of the phrase italicized above and arises out of the factual background hereinafter described.

Spa Haven was a real estate project involving an assemblage along Spa Creek in the Annapolis harbor. An existing apartment building was to be enlarged and converted to a condominium regime. There would be a yacht club marina, with the clubhouse in the basement of the condominium building. Adjoining sites would be developed for parking, tennis courts and a swimming pool. Kenneth was the creator and promoter of the business plan, the procurer of the mortgage financing and the leader in raising equity capital from investors. For his services he retained a 40% interest. Each appellant, when investing, signed subscriptions stating that they wished to purchase a specified percentage "equity in the Venture . . . ." The subscription form further recited that as a limited partner the subscriber's personal liability would be limited to the amount of the subscription, that the general partners assumed all other liability, that the general partners would share in the profits pro rata only after the limited partners' capital had been returned and that each partner would be

---

1. Chapter 544, Acts of 1980, effective July 1, 1980, added "involving real estate located in this State" immediately following "arising out of a real estate transaction." The change has no bearing on the case at bar.

entitled to the pro rata share of the income tax advantages including, *e.g.*, depreciation. Checks for the appellants' investments were made payable to Spa Haven Joint Venture. By letter on Bay Country Realty, Inc. stationery, and with the word "Realtor" typed beneath his signature, Kenneth personally guaranteed appellant Harold L. Sheppard (Sheppard) that Sheppard's investment would be returned within 30 days of Sheppard's written request to Kenneth, together with 10% per annum interest, on condition of Sheppard's relinquishing his share in the venture.[2] When the appellants received their IRS forms K-1 for the year ending December 31, 1976, it was noted that Spa Haven was reported to be a general partnership. So far as the record discloses, no partnership agreement of any kind has ever been signed by the investors and there is no certificate of limited partnership filed with "the clerk of the court" as then required by Md. Code (1975), § 10-102 (a) of the Corporations and Associations Article. In all but one of the 1976 deeds from the grantors of the parcels in the assemblage, the grantee is Spa Haven Joint Venture. It is described as a general partnership, consisting solely of Kenneth and Leala. Title to the remaining parcel was taken in the name of Kenneth's son who in 1978 conveyed that parcel to Spa Haven. The Spa Haven project failed and the property was sold at a public sale on March 16, 1979.[3] Demand had been made on Kenneth to purchase the claimants' interests in Spa Haven. Kenneth has acknowledged his promise to do so, but claims financial inability to perform.

The BWI venture envisioned a major marina and recreational center on the Magothy River in Anne Arundel County, at the site of the Mago Vista Beach Club. This property was owned by Magothy Corporation whose shareholders

---

2. Sheppard was the only claimant to testify before the Commission. It was stipulated that the testimony of the other claimants would be cumulative.

3. The Commission found Kenneth's poor management to be a major factor contributing to the failure. Kenneth did not appear at the hearing before the Commission. In his statement to a Commission investigator, Kenneth attributed the failure to construction delays and cost increases.

sold their stock. Who the buyer was does not specifically appear in the record. Nor can the legal structure of BWI be intelligibly stated from the record which simply contains a typewritten form, signed by Sheppard and headed "Baltimore-Washington International Yachting Center, Inc., Joint Venture Membership Application & Subscription." It recites payment of $7,500 "for the purchase of 1/2% equity in the venture organized to purchase the stock, land and assets of the Magothy Corporation . . . ." Investors' checks were made payable to B.W.I. Yachting Center Venture. Sheppard acknowledged that he had "received and read the prospectus and financial pro forma statements, [and] made independent investigation of the merits of the property, the partnership, the plans for development and the potential as an investment vehicle." The form recites that "[e]ach investor . . . can afford the purchase of a partnership interest to be held for personal investment . . . ." If there had been any prospectus, it is either not in the record or the subscription form is referring to a typewritten document of three and one-half legal size pages headed "Environmental Impact Statement." This document contains no internal indication that it was prepared for any governmental agency, but it describes the care which purportedly would be taken to preserve the ecology in the development of the site. Owners of other properties in the neighborhood and county officials apparently did not see it the same way. Governmental approvals were not obtained and the project failed. Kenneth, who was retaining 75% ownership in whatever entity was involved, had promised to repurchase investors' interests but did not do so after demand was made upon him. There is no indication that any partnership agreement was ever prepared or executed or that any certificate of limited partnership was ever recorded with respect to BWI.[4]

Commission fact findings included a finding that "at all times relevant to the Claimants' dealings with" Kenneth, he

---

4. One fact finding by the Commission was that none of the appellants had consulted with counsel before parting with his or her money in connection with either Spa Haven or BWI.

"held himself out to them as a licensed Maryland real estate broker." The Commission's first conclusion of law was:

(1) That the Claimants have been "aggrieved" by the action of the Respondent Kenneth Patrick, a real estate broker licensed by the Real Estate Commission of Maryland within the meaning of [§ 217A] in that he has failed to return to the Claimants the amounts of their investments as he personally guaranteed.

Appellants' claims were denied, however, because the Commission determined that the losses did not arise out of a real estate transaction, within the meaning of § 217A, inasmuch as appellants had "purchased investment shares or securities and did not purchase or lease real estate as is required by Section 217A."

Appellants assert that the phrase, "arising out of a real estate transaction," does not require that a claimant have engaged directly in a real estate transaction. Emphasizing the words "arising out of," they contend that they have met all of the elements of § 217A. They say that Kenneth was a real estate broker, they have been found to be "aggrieved" by Kenneth's action, and their losses, which measure the amount of the claims against the Fund, arise out of transactions in which Kenneth represented that real estate would be acquired by limited partnerships in which appellants paid to participate. Reinforcing this argument appellants point to Kenneth's use of Bay Country Realty stationery and to his references to himself as a realtor, all of which they say induced them to rely on his representations. The Commission takes the position that these claims do not arise out of a real estate transaction because § 217A limits eligible transactions to ones for which a real estate license is required for the broker's or salesman's activity. Here Kenneth was selling participations as limited partners in limited partnerships and a "limited partner's interest in the partnership is personal property." Md. Code (1975), § 10-117 of the Corporations and Associations Article. *See also In re*

*Panitz & Co.,* 270 F. Supp. 448 (D. Md. 1967), *aff'd sub nom. Hammerman v. Arlington Fed. Sav. & Loan Ass'n,* 385 F.2d 835 (4th Cir. 1967). Because a real estate license is not required for one to sell personal property, the Commission concludes that the subject claims are not within § 217A.

For the reasons which we set forth below, our conclusion is that "arising out of a real estate transaction," as used in § 217A (a), are words of limitation on the scope of eligible claims against the Fund. In order for a licensee's loss causing conduct to be the basis of a claim against the Fund, that conduct must arise out of a transaction in which the licensee is acting in a capacity for which a license is required. The types of activities for which a license is required are set forth in the definition of "real estate broker" found in § 212 (a).[5]

Legislative history dictates this construction. Prior to July 1, 1971 a real estate broker was required to post with the Commission a corporate bond in the sum of $10,000 "for the use and benefit of the public who may suffer or sustain any loss by reason of a violation of [the] subtitle by such brokers . . . ." Md. Code (1957, 1968 Repl. Vol., 1970 Supp.), Art. 56, § 217 (b). By Chapter 648 of the Acts of 1971 the bond requirement was repealed and a real estate guaranty fund established. The Fund was derived from a one time

---

5. Section 212 (a) provides:

(a) *"Real estate broker" defined.* — "Real estate broker" shall mean any person, association, copartnership or corporation foreign or domestic, who for another and for a fee, commission or any other valuable consideration sells, purchases, exchanges, leases, rents or collects rent for the use of real estate or who attempts or who offers by verbal solicitation, advertisement or otherwise to perform any such function, or who aids, attempts or offers to aid, for a fee, any person in locating or obtaining for purchase or lease any residential real estate, or who is regularly engaged in the business of dealing and trading in real estate or leases and options thereon, or who engages in the business of charging an advance fee or contracting for collection of a fee in connection with any contract whereby he undertakes primarily to promote the sale of real estate through its listing in a publication issued primarily for such purpose, or for referral of information concerning such real estate to brokers, or both, or who is engaged in the business of subdividing and selling land in building lots or sites, whether such real estate is located in this or any other state or the District of Columbia.

assessment upon existing and newly licensed real estate brokers and salesmen in the amount of $20 each. Whenever the Fund falls below $250,000, a reassessment is to be imposed. § 217A (b) and (c). In view of the $250,000 minimum amount it seems unlikely that the General Assembly contemplated having the Fund make investors whole for losses arising out of purchasing participations in real estate syndications.

Under the 1971 legislation, an eligible claimant was a person aggrieved by certain misconduct of a licensee but, as enacted, the statute did not contain the phrase, "arising out of a real estate transaction." This was added by Chapter 309 of the Acts of 1976. The title to that Act states it was for

> the purpose of specifying that the Real Estate Guaranty Fund applies *only* to *transactions arising out of a real estate business* and that recovery is restricted to actual loss; and clarifying language. [Emphasis added.[6]]

Construing the amendatory language in relation to the title makes plain that the broad interpretation advanced by appellants was not intended. The real estate transaction referred to in the Act is not any transaction in which real estate is in some way involved, but it is a transaction arising out of a real estate business. In the context of the real estate broker's subtitle, a real estate business is the business of acting as a real estate broker. It is a business in which the one conducting it engages in those activities for which a broker's license is required. Section 217A (a) uses "real estate transaction" in that sense.

Section 212 (a), in delineating the scope of the broker's license requirement, does not in express terms or by necessary implication embrace syndication of investments in real estate. In light of the position taken by the Commission in the case at bar, we take it to be a fact that the Commission

---

**6.** Chapter 309 also substituted at the end of subsection (a) the words "actual loss" for the word "claim."

has not administratively construed § 212 (a) to reach the sale of interests in a limited partnership which is to own and develop real property. To the extent that the issue has been raised in other states under general statutes for the licensing of real estate brokers, the sale of limited partnership interests in a real estate development venture does not require a broker's license. *See Bonin v. Chestnut Hill Towers Realty Co.,* 14 Mass. App. 63, 436 N.E.2d 970 (1982), *cert. granted,* 387 Mass. 1102, 440 N.E.2d 1177 (Sept. 30, 1982) (security dealers license required); *Reiter v. Greenberg,* 21 N.Y.2d 388, 288 N.Y.S.2d 57, 235 N.E.2d 118 (1968); *Sunshine v. Mid-South Construction, Inc.,* 496 S.W.2d 708 (Tex. Civ. App. 1973).

*Leishman v. Goodlett,* 608 S.W.2d 377 (Ky. App. 1980) is somewhat analogous. That case presented a claim against a recovery fund established by Kentucky statutes relating to real estate brokers and salesmen. Ky. Rev. Stat. § 324.410 (1) (1972) authorized payment of up to $10,000 "[w]henever a licensee has been duly found guilty of violating any one or more of the provisions of" the real estate regulatory statute or rules promulgated thereunder. An individual who was licensed in Kentucky as a real estate salesman borrowed $10,000 from the claimant for use in completing a house which the licensee was then constructing. The licensee misrepresented that his note evidencing the obligation would be a lien against the house. Claim against the fund when the $10,000 was not repaid was rejected on the following rationale (608 S.W.2d at 378):

> We hold that appellee has no right to recover the loss sustained by her from the fund. Although his dealing with appellee did involve a loan, the proceeds of which were to be used in completing improvements upon real estate, it cannot be said that Leishman was acting in the capacity of a broker or salesman. At the most he was a borrower who was also a builder-developer of real estate. He was not attempting to buy, sell, lease or rent any real property to appellee.

A literal reading of the statute would subject the fund to potential liability for any substantial misrepresentation or any other improper, fraudulent or dishonest conduct of a licensee whether or not such conduct was in his capacity as a broker or salesman. Under a literal interpretation of the statute the fund might find itself liable to reimburse the payee of a "cold" check written by a licensee, or to reimburse the owner of property stolen by a licensee.

We cannot give the statute such an interpretation because the result in our view leads to an absurdity. The purpose of the act is to protect the public from unscrupulous brokers and salesmen. *Sims v. Reeves,* Ky., 261 S.W.2d 812 (1952). The obvious intent is to protect the public from unscrupulous acts committed by realtors in their capacity as brokers and salesmen, not in their private capacity.

In the case at bar and from the standpoint of the real estate brokers' subtitle, it was legally irrelevant to the type of transaction into which appellants proposed to enter that Kenneth and his salespersons were licensees. Absent any loss causing conduct by a licensee, acting as such, the Fund is not liable.[7]

> *Judgment of the Circuit Court for Baltimore County affirmed.*
> *Costs to be paid by the appellants.*

---

7. There is no merit to appellants' additional contention that the construction of § 217A (a) which we adopt is a violation of equal protection. It is a reasonable classification to protect by the Fund those who are caused loss by a licensee, acting as such, and to exclude those who suffer loss as a result of misconduct by a person acting in the transaction in a capacity which, from the standpoint of the real estate brokers' statute, an unlicensed person could fulfill.